AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: /s/ *Julia C. Barry* 6/13/2024

# UNITED STATES DISTRICT COURT
## for the
### Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH SUBSCRIBER<br>JENNIFER LOUISE BAXTER THAT IS STORED AT<br>PREMISES CONTROLLED BY APPLE INC. | Case No.   M-24-505-SM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and incorporated by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 242 | Deprivation of Rights Under Color of Law |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Casey S. Cox, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/13/2024

*Judge's signature*

City and state: Oklahoma City, Oklahoma

Suzanne Mitchell, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
SUBSCRIBER JENNIFER LOUISE
BAXTER THAT IS STORED AT
PREMISES CONTROLLED BY APPLE
INC.

Case No. ___M-24-505-SM___

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Casey S. Cox, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2006. I was initially assigned to the Baltimore Division for approximately four years. Since then, for approximately 13 years, I have been assigned to the

Oklahoma City Division of the FBI. During this time, I have conducted numerous investigations

of individuals involved in criminal violations in the areas of civil rights, public corruption, drug

trafficking, bank robbery, weapon crimes, violent crimes, and Indian Country crimes. I have

coordinated the execution of search and arrest warrants pertaining to individuals involved in the

above-listed illegal activities, conducted physical surveillance of individuals involved in such

criminal activities, analyzed records documenting these activities, monitored and supervised

court-ordered interceptions of wire and electronic communications occurring over telephones

and other electronic devices utilized by individuals engaging in such activities, presented

testimony in federal court and grand jury regarding individuals involved in criminal activity, and

have spoken with informants and subjects, as well as other local and federal law enforcement

officers, regarding the manner in which criminals and criminal organizations engage in criminal

activity. I currently investigate civil rights matters in the State of Oklahoma, including the

Western District of Oklahoma. As part of my law enforcement duties, I am statutorily charged

with investigating federal criminal violations. As a federal agent, I am authorized to investigate

violations of laws of the United States and to execute warrants issued under the authority of the

United States.

3.      This affidavit is intended to show merely that there is sufficient probable cause

for the requested warrant and does not set forth all of my knowledge about this matter.

4.      I am investigating allegations of civil rights violations by law enforcement

officers and a jail corrections nurse acting with deliberate indifference to the serious medical

needs of a pretrial detainee previously detained at the Garvin County Jail in Pauls Valley,

Oklahoma, as well as the same officers and nurse acting with deliberate indifference to the

substantial risk of serious harm arising from an inmate assault of the same pretrial detainee.

2

Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law) have been committed by former Garvin County Jail Sergeant Jennifer Baxter, former Garvin County Jail Nurse (and Turnkey Health contract employee) Lynnsee Noel, and former Garvin County Jail Deputies Alesha Danielle Ingram and Vincent Matthews. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      As described below, there is probable cause to believe that evidence of these offenses is contained on a cellular phone operating on the T-Mobile network assigned number 405-965-1307 (International Mobile Subscriber Identity: 310260580422740 (Apple iPhone with blue case)) and operated by former Garvin County Jail Sergeant Jennifer Louise Baxter ("SUBJECT PHONE"). A preservation request for such records was previously sent to Apple on June 3, 2024. I submit this application and affidavit in support of a search warrant authorizing a search of these items further described in Attachments A and B.

7.      The FBI is investigating allegations that Baxter and other Garvin County Jail personnel deprived a pretrial detainee named Kayla Turley ("Turley") of her due process rights under the Fourteenth Amendment, which included the right to be free from the deliberate

indifference of individuals, acting under color of law, who had been entrusted with Turley's custody and care. This explicitly included the right to be free from these individuals' deliberate indifference toward Turley's medical needs or to a substantial risk of serious harm to her safety while incarcerated at the Jail.

8.     The FBI has obtained Garvin County Jail surveillance footage (video and audio) relevant to Baxter's criminal activity on August 5, 2023, through August 7, 2023. The footage captures, among other locations, Garvin County Jail Cells 3 and 8, as well as the Jail's processing room, in which staff worked and monitored live surveillance camera footage feed, with audio, from the Jail cells. Many of the following facts supporting probable cause for the requested warrant are reflected in the surveillance footage from Cell 3, Cell 8, and the processing room. A visit to the Jail, numerous interviews of Jail personnel and other witnesses conducted by myself and/or Oklahoma State Bureau of Investigation agents, hospital records, and other documentary evidence further supplement facts derived from this footage.

9.     Chickasaw Nation tribal pretrial detainee Turley was booked into the Garvin County Jail on July 14, 2023, pursuant to an agreement between the Chickasaw Nation and the Garvin County Sheriff's Office to house Chickasaw Nation pretrial detainees at the Garvin County Jail when they have been charged with offenses charged under tribal law. On August 2, 2023, and August 4, 2023, law enforcement officers transported Turley from Garvin County Jail to local hospitals, where she was diagnosed with gallstones and a sodium deficiency. Turley was scheduled to return to the hospital for surgery to remove those gallstones on August 7, 2023. It is alleged that just over a week later, on August 6, 2023, while Turley was still detained at Garvin County Jail, Jail personnel willfully refused to provide necessary medical care to Turley and willfully failed to keep other inmates from harming Turley, despite being aware that Turley

4

was seriously ill and faced a serious risk of physical harm from other inmates and despite having

the ability and opportunity to intervene. This deliberate indifference ultimately culminated in

Turley medically deteriorating to the point that Turley was flown via medical helicopter during

the early morning hours of August 7, 2023, from the Jail to a hospital, where she died from

medical complications a few days later.

      10.    The following entries summarize key moments on August 6, 2023, that provide

evidence for the existence of probable cause for this search warrant: First, at approximately

12:56 a.m. on August 6, 2023, at the Garvin County Jail, inmate Tiffani Stapp called the Jail

processing room on an intercom system inside Cell 8, a multi-inmate cell, to relay her concern

about a fellow inmate, Turley. Stapp told Jail Deputy Jamie Sasnett that Turley's eyes were

crossed and that whatever was happening with Turley was scaring her. Jail Deputy Sasnett

replied to inmate Stapp that there was nothing Jail staff could do about it at that time. He told

Stapp to wait until the morning, and to try to make a sick-call appointment then.

      11.    At approximately 1:34 a.m., Jail deputies moved Turley from Cell 8 to Cell 3

because Cell 8 inmates were getting upset with Turley as she cried out in pain, and Jail staff

believed the inmates might harm Turley due to their frustration. Jail deputies told Turley to hold

onto the wall to support herself when moving from Cell 8 to Cell 3. Indeed, Jail Deputy Sasnett

can be heard on video/audio surveillance recordings telling a police officer who was booking a

new inmate into the Jail that Turley was having some medical issues and that the other inmates

were getting tired of hearing Turley "whine." Sasnett also relayed that Turley's issues were not

drug related but "legitimate medical issues." Cell 3 is a segregation cell that is much smaller

than Cell 8, and is typically used for single or double occupancy. Another inmate named

Breanna Lyons was already housed inside Cell 3 when evening shift Jail staff moved Turley into

Cell 3. The Jail video/audio recordings captured Turley regularly yelling out in pain both in Cell 8 and Cell 3 over the course of the night of August 5 and throughout the day of August 6.

12.     At approximately 6:57 a.m., on August 6, 2023, Jail Sergeant Melissa Melton told inmate Lyons: "We know she [Turley] hurts but it's not that serious of [unintelligible]. We are working on it. Trust me, when Jennifer [known to be Jail Sergeant Jennifer Baxter] gets here I'll talk to her."

13.     At approximately 7:19 a.m., from outside of Cell 3, Jail Nurse Lynnsee Noel asked Turley if she wanted her medicine. Turley responded that she did, but could not get up to retrieve it from the cell door. Noel told Turley that she had to get up to get her medication. Baxter then appeared at the door of Cell 3 and also told Turley she had to get up and come to the door to get her medication. Turley replied by mumbling and saying "okay." Sergeant Baxter added that they were not going into the cell and that Turley had to get her medication at the door if she wanted it. A few minutes later, at approximately 7:22 a.m., outside of the processing room, Noel told Baxter, "Yep, and if she [Turley] doesn't get up then she's not getting [her medication]. I'm not playing this fucking game with her." At approximately 7:44 a.m., Baxter returned to Cell 3 and asked Turley if she wanted her medications. Turley told Baxter she did want her medication and that she was trying to stand up. Baxter told Turley she was about to go back to Cell 8, that Turley should "quit playing," and "we know there is nothing wrong with you until somebody comes around." Baxter then told Turley: "You need to get the hell up and come get your medicine if you're going to do it and quit lying there." Turley was not given her medication at this time since she was unable to stand up to retrieve it at the cell door.

14.     At approximately 7:42 a.m., Baxter used the SUBJECT PHONE to call Lieutenant Tim Joslin and asked, "Hey, what can we do about Turley? Is there not anywhere we

can send her? I don't know man, she keeps screaming, 'help me', and keeps screaming. She's in Cell 3 right now and I got what's her name [known by the affiant to be inmate Breanna Lyons] who I put in there yesterday." Baxter went on to explain the need to move a male inmate into Cell 3 and that the other female inmates in Cell 8 did not want Turley back in the cell because of her repeated and loud cries for help over the course of the previous night.

15.     At approximately 7:43 a.m., after ending her call with Lieutenant Joslin on the SUBJECT PHONE, Baxter told Noel, "He [Lieutenant Joslin] said to call Lighthorse [tribal police] and tell Lighthorse to come get [Turley] and take her back to the hospital." Nurse Noel replied, "that's not on me, I'm not doing it, that's not coming from me." Surveillance footage shows Baxter texting on the SUBJECT PHONE while Nurse Noel tells Baxter that she does not agree with sending Turley to the hospital. Noel then asks Baxter what the other female inmates in Cell 8 talked to her (Baxter) about. Baxter replies: "That they don't want [Turley] in there, that they'll beat her the fuck up, they actually like Jennifer we won't touch her, but we'll tell her to shut the fuck up. I said tell her to shut the fuck up, that's what I'm going to do because she's getting on my fucking nerves, and I don't even live in here with her."

16.     At approximately 7:45 a.m., Baxter, accompanied by Noel, opened the door to Cell 3 and told Turley to get up. Turley replied, "Okay, please help me." Baxter responded, "You can get up, you're fine, there's nothing wrong with you, get up." Baxter then told Turley that Turley was not really trying to get up and said, "If I have to make you get up we're going to have problems." Baxter went on to tell Turley "Get up, there's nothing wrong with you", and "I've seen you on camera, you're just fine, get up." Noel then said to Turley: "All your stuff came back fine except you have some stones in your gallbladder. Let's go, now c'mon."

7

17.    At approximately 7:48 a.m., Baxter entered Cell 3 and lifted Turley off of her sleeping mat. Video surveillance captures Turley choking and crying out in pain as Baxter picks her up. As Baxter moves Turley down the hall to Cell 8, Turley yelled, "You're hurting me." Baxter then pushed Turley into Cell 8 and shut the cell door. Upon entering Cell 8, Turley stumbled to her left and unsuccessfully tried to grab hold of another inmate and a bunk bed to right herself. Turley collapsed, hitting her elbow on the edge of a bunk bed, hitting her head on the ground, and defecating on herself. Only the other inmates in Cell 8 came to Turley's aid. No Jail staff entered the cell to render any aid to inmate Turley. At approximately 7:51 a.m., Sergeant Baxter told Nurse Noel, Jail Deputy Vincent Matthews, and Jail Deputy Alesha Danielle Ingram, "I think [Turley] shit herself when we fell, I mean she fell. She said she was trying to get up, no you ain't you're just lying there motherfucker." At approximately 7:53 a.m., Sergeant Baxter told the other inmates in Cell 8, "Hey, I'm trying to get [Turley] out of here, don't be rude. If you want me to get her out of here, don't make comments like that again." Other Cell 8 inmates then gave Turley a shower and requested new prison clothes for Turley because she had defecated on herself. After helping her, however, the Cell 8 inmates grew exasperated with Turley because she was unable to stand and defecated on herself again.

18.    At approximately 7:58 a.m., Baxter had a conversation with Noel about how Turley fell and how much it must have hurt Turley. Noel responded sarcastically, "Well that fucking sucks doesn't it." Noel asked Baxter if she was going to call to request Turley be taken back to the hospital and Baxter replied, "When she fell I was like, 'oh, shit.' I don't fucking know, like I don't know how to do that, I mean like I do know how to do that obviously." Noel responded, "Like Jail admin wants her sent back to the hospital, I mean that's the best." Baxter replied "Okay." They continued to talk about not knowing whom to call and decided that Baxter

should call Lieutenant Joslin on the SUBJECT PHONE to find out who to call to get Turley sent back to the hospital.

19.    At approximately 7:59 a.m., Baxter used the SUBJECT PHONE to make a call, but called a wrong number. At approximately 8:01 a.m., Baxter made a call using the SUBJECT PHONE to call about a "native" who needed to be transported to the hospital. However, Baxter called the Chicka*sha* Police Department instead of the Chicka*saw* Nation Lighthorse Police Department.

20.    At approximately 8:09 a.m., Sergeant Baxter sent a text message using the SUBJECT PHONE to Lieutenant Joslin asking for a telephone number for Lighthorse. Joslin sent back a Google screenshot with a number for the Lighthorse Police Department. At approximately 8:11 a.m., Baxter can be seen on surveillance footage texting on the SUBJECT PHONE. At approximately 8:12 a.m., Baxter called the Lighthorse Police Department. Lighthorse Police Department gave her the phone number for Joe Hankins, the jail coordinator for the Chickasaw Nation. Baxter wrote down the number on a sticky note. However, Baxter never called Hankins to get approval for a Lighthorse police officer to transport Turley to a hospital. Baxter, instead, again called Lieutenant Joslin on the SUBJECT PHONE, talked about Turley defecating on herself three times, and made fun of how Turley was walking. Baxter told Joslin that Noel thought there was nothing wrong with Turley. Baxter then said to Joslin on the SUBJECT PHONE, "So [Turley] can't go to another facility? So, we are just supposed to deal with her fucking ass over here fucking flopping, falling down everywhere, and hitting her head, hitting her elbows. That should be Lighthorse's problem, not ours. They need to do something with her."

9

21.     Following the call on the SUBJECT PHONE with Joslin, Baxter told Jail Deputies Matthews and Ingram that she got into it with Joslin because of Turley and Joslin's unwillingness to send Turley someplace else. Baxter told them "So, I was like we are just supposed to fucking deal with her [Turley] falling all over the place, hitting her head, twisting her pinky, hitting her elbow, and hitting her lip, shitting on herself. These motherfuckers are having to clean her up three times, she's in there shitting all over her fucking self. He [Joslin] was like, 'What are we supposed to do just send her someplace?' Yeah, because then, it won't be our fucking problem. Sounds like to me Lighthorse needs to come get their fucking inmate and either let her the fuck go or something. He was like, 'She's got a sixty-five-thousand-dollar bail.' I was like, 'I don't give a fuck, I don't give a fuck.'"

22.     At approximately 8:52 a.m., Baxter told Jail Deputies Matthews and Ingram, "And then when she (unintelligible), I guess her foot got caught up or something. I don't know, she went down, and her fucking knee hit that, I guarantee it hit the corner of that son-of-a-bitch. I didn't fall on top of her, but I fell with her, and then I was like [makes motion with her arms as if she is picking something up]." The three of them then laughed about how Baxter had to grab Turley to pick her up. They continued to laugh when Matthews offered up another way to carry Turley and Baxter replied, "No, I got enough satisfaction by her going [makes flopping motions with her body and arms to demonstrate how inmate Turley looked trying to walk down the hall]."

23.     At approximately 8:54 a.m., Cell 8 inmates can be heard yelling at Turley to shut up, after which Baxter, watching on live surveillance footage from the processing room, said, "Oh, they're probably telling her to shut the fuck up." After making this statement, Baxter stopped watching the surveillance footage from Cell 8. At this time, an unknown Cell 8 inmate

10

threw a cup of water at Turley, who was sitting, disoriented, on a mat on the floor of Cell 8. The cup bounced off the wall and hit Turley in the face, splashing her with water. Turley can be heard crying out, "Please help. Please help, me." Between 9:19 a.m. and 9:24 a.m., the Cell 8 inmates told Jail Deputy Ingram that Turley needed to be taken out of the Cell "for her safety." The inmates asked Ingram what would happen if Turley "gets her ass whooped." The inmates also talked to Ingram about kicking inmate Turley in the head and "taking a charge." Inmate Tiffani Stapp then told Turley, "If you get any louder, I'm going to slap you."

24.     At approximately 9:41 a.m., Baxter and Ingram entered the Jail processing room, joining Noel and Matthews, who were already in the room. The four then discussed how they believed that Turley was faking her condition. Baxter eventually told the others, "Makes me want to punch her." Baxter told Noel about how the other inmates were yelling at Turley, and that she did not blame them for it. Baxter then stated that the other inmates threw water on Turley because she wouldn't be quiet, evidencing that Baxter knew that at least one Cell 8 inmate had already sought to physically harm Turley.

25.     At approximately 9:53 a.m., per Jail surveillance from Cell 8, inmate Tiffani Stapp stood over Turley, put her face close to Turley's, and threatened Turley. At this same time, Baxter, Noel, Ingram, and Matthews were in the Jail processing room watching the situation unfold via surveillance and could hear the inmates yelling at Turley, which prompted the Jail staff to begin laughing. While Jail staff watched the live footage of Cell 8, Baxter said to the others, "[Stapp] said, 'don't even say okay, just shut the fuck up.' Get 'em, Tiff. Get em." At approximately 9:57 a.m., Stapp again threatened Turley and slapped her hand against the wall above Turley's head. Stapp told inmate Turley, "Next time, it's going to be your goddamn face," and told Turley that she was going get her "ass whooped." Noel saw this on surveillance in the

11

Jail processing room and told the other Jail staff members about it. The Jail staff then turned up the volume on the surveillance so that they could hear what was being said in Cell 8. Baxter and Matthews specifically discussed inmate Stapp threatening Turley and the fact that Stapp said she would gladly whoop inmate Turley's ass, prompting laughter from Baxter. Between 9:58 a.m. and 10:00 a.m., inmate Stapp threw two shoes at Turley. One of the shoes hit Turley in the stomach, causing her to cry out in pain. Jail staff continued to watch and listen but did not take any actions to intervene. The staff members then discussed whether the shoes hit Turley in the face or in the chest.

26.    Jail staff continued to watch and listen, taking no steps to intervene or stop the physical violence unfolding in Cell 8. At approximately 10:02 a.m., Stapp can be heard on surveillance threatening Turley again. Baxter, watching Stapp threaten Turley, joked with Noel, Matthews, and Ingram, "Days of Our Lives, Garvin County edition" and remarked, "This is fantabulous, fellas, this is fucking great." Ingram asked Baxter, "What the hell are we going to do if she does beat the shit out of [Turley]?" Baxter replied "Then she beats the shit out of her. I don't know what to tell her. I don't have anywhere to put her." Baxter, Noel, Ingram, and Matthews then laughed as they watched Turley being verbally abused by inmates Stapp and Kathleen Tolison.

27.    At approximately 10:03 a.m., Stapp put a blanket over Turley's head. Watching this from the processing room, the Jail staff laughed. While laughing, Matthews said, "She just put a blanket over her [Turley's] head." Noel then said, "She's [Turley's] going to get her ass beat." Baxter replied, "If she get her ass beat, then we're just going to the hospital. There's our break. There's our way to the hospital."

12

28.     At approximately 10:04 a.m., Stapp called the processing room on an intercom system accessible from Cell 8 and told the processing room that she was "struggling." She then asked if there could be a "glitch in the system." Baxter laughed and told Stapp that they were watching Cell 8 from the processing room, before saying to Stapp, "Days of Our Lives Garvin County edition women wildin' out." Baxter then said "yes" to Stapp's question about if there can be a glitch in the system. An unidentified inmate in the background can be heard saying "two minutes window, one minute."

29.     At approximately 10:05 a.m., an unidentified Cell 8 inmate threw a water cup at Turley that bounced off the wall and hit Turley in the head. Baxter, Noel, Matthews, and Ingram were watching Cell 8 surveillance when this happened, and Matthews yelled out, "Oh, shit." All of the Jail staff then began to laugh about what was happening to Turley. Baxter then took out the SUBJECT PHONE and texted Joslin. From the SUBJECT PHONE, Baxter sent Joslin a text saying, "This bitch about to get beat up." Joslin asked who and Baxter replied "Turley." Baxter and Noel then continued to talk about how they thought that Turley was faking her condition.

30.     At approximately 10:09 a.m., Stapp told Turley that she was giving her the last warning and that she didn't "give a fuck about catching another charge." Baxter turned up the volume on the feed from Cell 8 so that she and the other jailers could hear it in the processing room. Baxter, Noel, and Ingram all heard the threats being made to Turley as well as Stapp's statement about not being afraid to catch a charge. The three Jail staff members then began to predict what was going to happen to Turley next. Baxter said, "With that fucking (unintelligible) in her hand, bam [makes punching motion] right in her face." Ingram said, "I'm more concerned she is going to take it [Turley's head] and slam it into the wall." Noel replied, "No, she's [Stapp] going to hit her [Turley] and then her head is going to bounce off the wall [makes motion like

13

something is bouncing off the wall].ʺ The three Jail staff members continued to listen and watch as Stapp attempted to make Turley drink water. After Turley was unable to drink, Stapp grew frustrated and threw the water in Turley's face. An unidentified inmate then called the Jail processing room to tell staff members that Turley needed a new shirt because the one she was wearing was all wet. Baxter replied, "Oh man, well that sucks, don't it?"

31.    At approximately 10:15 a.m., all four Jail staff members listened via surveillance to Stapp yelling at Turley about having to deal with Turley for the past two days. The Jail staff watched and laughed. Baxter then said, "They're taking their own trash out, I'll just let 'em. [laughs]. I'll let 'em. Get 'em, get 'em (unintelligible)."

32.    At approximately 10:23 a.m., Baxter and Noel spoke again about how they believed Turley was faking her condition. Baxter told Noel, "Makes me want to fucking elbow her right in the fucking head and face [makes an elbowing motion]." Noel replied, "I used to have compassion." Baxter continued, "Use some fucking elbow strikes and knee strikes on that bitch. I guarantee she'd be hurtin' for real then. I'd give her a place to hurt. Right across the fucking jaw, right in the fucking stomach. She thinks her stomach hurts, let me do some knee strikes." Noel replied: "Break her jaw, then she wouldn't really be able to talk." Baxter chimed in: "Break her with this elbow, yep fuck with me! [Baxter again makes an elbow striking motion with her elbow]."

33.    Lunch was served to the Cell 8 inmates at approximately 10:45 a.m. Turley did not get up to retrieve her food tray, and Jail staff members refused to allow anyone to take Turley's tray to her. While filling out the shift log, Ingram asked Baxter, "Would I put that she [Turley] refused it?" Baxter told Ingram, "Just say she refused to get up and get her tray." At this same time Baxter can be seen on surveillance looking at the SUBJECT PHONE.

34.     At approximately 10:59 a.m., Cell 8 inmates pushed Turley underneath a picnic table, where surveillance cameras could no longer fully capture Turley.  Ingram, who was watching this on the surveillance camera, gasped out loud in the processing room.  Baxter asked what happened and Ingram told her that Turley was pushed underneath the picnic table.  Baxter then watched the surveillance briefly before continuing to look at the SUBJECT PHONE.

35.     At approximately 11:01 a.m., per surveillance, Stapp leaned underneath the picnic table, over Turley, and audibly slapped Turley in the face.  As she did this, Stapp covered Turley's mouth, muffling Turley's cries of pain.  Baxter and Ingram watched the surveillance from the processing room as this occurred.  Neither Baxter nor Ingram took any action to intervene, even though Turley's muffled screams could be heard in the Jail processing room through the camera footage they were watching.

36.     At approximately 11:10 a.m. and 11:16 a.m., Stapp again slapped Turley underneath the picnic table.  None of the Jail staff were watching the surveillance of Cell 8 in the processing room when these slaps occurred.

37.     At approximately 11:48 a.m., 11:52 a.m., and 1:36 p.m., inmate Tolison walked over to Turley's location underneath the picnic table in Cell 8 and poured water on Turley's face.  At approximately 2:17 p.m. and 2:42 p.m., Tolison walked over to Turley, leaned under the picnic table, and slapped Turley in the face.  At 2:48 p.m., Tolison again poured water on Turley's face.  At 3:06 p.m. and 3:10 p.m., Tolison slapped Turley again.  At 3:24 p.m., Tolison leaned under the picnic table, blocking the Cell 8 camera's view of Turley.  Although Tolison partially blocked the surveillance camera, her movements and audio from the surveillance indicate that she briefly choked Turley underneath the table.  Jail staff were still not watching surveillance cameras during this time.  At 3:25 p.m., Tolison slapped Turley a final time,

15

prompting Baxter, who had returned to the processing room, to briefly look over at the monitor

depicting Cell 8's live feed. At no time during any of these incidents did any member of Jail

staff intervene, despite the inmate violence directed at Turley.

38.    At 4:08 p.m., Turley was moved by Baxter, assisted by nurse Noel, from Cell 8

back to Cell 3. Inmate Tolison lifted Turley up from the ground in Cell 8 and handed her off to

Baxter. Turley could not walk on her own and needed help to make it from Cell 8 to Cell 3.

39.    At 4:22 p.m., Nurse Noel came to Cell 3 and asked Turley, again, if she wanted

her medications, saying, "If you want your meds, you have to get up to get them. Do you want

your meds? Nope didn't think so." Noel, once again, did not give Turley her prescribed

medications.

40.    At 4:44 p.m., Baxter came to Cell 3 to offer food to Turley. However, when

Turley, again, was unable to stand up to come to the door to get her food, Baxter left without

giving Turley any food.

41.    At approximately 6:33 p.m., Baxter was replaced on shift by Night Shift Sergeant

Melissa Melton. Baxter told Sergeant Melton about some, but not at all, of what had happened

during her shift, noting that Turley was now in Cell 3, that her clothes were wet, and that she had

urinated and defecated on herself. From what was obtained via surveillance video and the log

sheet, Baxter did not tell Melton about Turley falling and hitting her head, other inmates

assaulting Turley, or that she (Baxter) and Noel had given Turley no food or medication during

the day shift.

42.    Between approximately 6:36 p.m. and 10:33 p.m., Melton and another Nightshift

Jail Deputy, Paula Kelly, checked on Turley regularly. They repeatedly looked into Cell 3,

through a window in the door, and tried to get Turley's attention. However, during this time,

Turley repeatedly failed to respond to their questions, and barely moved. At 10:43 p.m., Melton mentioned to Kelly that she was waiting for a patrol deputy (a sworn police officer) to enter Turley's cell to check on her because Garvin County Jail policy did not permit jailers to enter inmate cells without a patrol deputy. However, at 11:23 p.m., Melton and Kelly entered Cell 3 without a patrol deputy. They asked Turley what had happened to her arm, which had significant bruising at that time, but Turley did not respond. Kelly and Melton left the Cell shortly thereafter, despite Turley's lack of response.

43.    At 11:32 p.m., the Cell 3 surveillance depicts Turley suffering what appears to be a seizure. Minutes later, blood and other fluids can be seen coming out of Turley's mouth and pooling on the floor.

44.    At approximately 12:15 a.m., on August 7, 2023, Kelly again observed Turley through the Cell 3 door. A minute later, Melton came to the door, and told Turley that she needed to talk to her. Turley did not respond. Shortly thereafter, two police officers from the Lindsay Police Department, Officers Corey Rouse and Austin Smith, arrived at the Garvin County Jail to book an inmate into the Jail. Melton and Kelly asked Officer Rouse if he had medical training and if he could help them assess Turley. Rouse agreed, and the three of them went to Cell 3.

45.    At 12:23 a.m., Rouse, Melton, and Kelly entered Cell 3. Upon rolling Turley over, they saw blood and foam coming out of her mouth. Melton immediately told Kelly to call an ambulance. Paramedics arrived approximately 10 minutes later. Shortly after assessing her condition, the paramedics decided to airlift Turley to a larger regional hospital. Turley was taken to a nearby airstrip, placed into a medevac helicopter, and airlifted to Norman HealthPlex in Norman, OK. Upon arrival at Norman Healthplex, physicians determined that Turley had lost

17

brain function, which she would not recover. On August 9, 2023, Turley was taken off of life support, passing away shortly thereafter.

46.    On May 3rd, 2023, The Oklahoma Board of Medicolegal Investigations' Office of the Chief Medical Examiner released a coroner's report stating that Turley's probable cause of death was "multisystem organ failure" due to "sequelae of hepatitis of unknown etiology," and listed her manner of death as "undetermined."

47.    Subsequent toll record searches of Sergeant Jennifer Baxter's T-Mobile account for telephone number 405-965-1307 show that Baxter used her telephone to place or receive numerous calls on August 6, 2023. Over the course of that day, Baxter received 9 incoming telephone calls and 9 incoming text messages. She placed 1 outgoing call and 8 text messages. Of note, 5 of those incoming calls/texts, and 6 of those outgoing calls/texts were to a number, 405-740-2349, that belongs to Lieutenant Timothy Joslin, her direct supervisor at the Garvin County Jail.

48.    Between August 7, 2023, and August 9, 2023, the days that Turley was at the Norman Healthplex, Baxter received 75 incoming calls/texts and placed 109 outgoing calls/texts. Of those, 7 outgoing and 9 incoming calls/texts were to and from, respectively, Lieutenant Joslin. During this same timeframe, Baxter also placed 10 outgoing calls/texts and received 10 incoming calls/texts from a telephone with the number 405-926-7915, a number identified through subsequently obtained toll records to belong to Nurse Lynnsee Noel.

49.    During their initial investigation of this incident, Chickasaw Nation Lighthorse Police officers took voluntary photographs of text messages from Sgt. Baxter's telephone. These messages included the following:

18

a. A message sent on August 1, 2023, to Joslin stating "Lynnsee wanna know if we can house this Turley somewhere else besides here."

b. Previously referenced messages sent on August 6, 2023, to Joslin asking for information to contact Lighthorse Police.

c. A previously referenced message sent on August 6, 2023, at 10:05 a.m., to Joslin stating, "This bitch bout to get beat up." Joslin asks to whom Baxter is referring, and Baxter replies, "Turley...man it's bad in there."

d. A message sent to Joslin on August 7, 2023, at 10:28 a.m., asking, "Am I in trouble?" followed by a message sent at 12:36 p.m., after not receiving a response from Joslin, saying, "Tim!! Am I in trouble?" to which Joslin responded, "No." Baxter then messaged: "Ok I'm over here freaking out."

e. A message sent to someone saved in Baxter's phone as "Tina," with telephone number 580-768-5707, in which Baxter tells Tina that she is "freaking out about this Turley thing" and asks Tina, "[A]re we in trouble?"

f. Messages sent to Noel during the morning August 7, 2023, after Turley left the Jail for the hospital. At 10:21 a.m., Baxter sent a message saying, "I[ ]d[on't] k[now] w[hat ]t[he ]f[uck] is going on..", then, at 11:56 a.m., "I'm freaking t[he ]f[uck] out." Noel then replied, "Why[?]", to which Baxter replied, "Because what if I get fired lol[?] After they investigate shit.. I[]d[on't ]k[now] I'm just nervous."

g. Messages sent to Noel on August 14, 2023, at 10:22 a.m., asking if she knew whether Turley had passed away, and lamenting that she had.

h.  Messages sent to Noel on August 18, 2023, discussing conversations with
investigators.

i.  Message sent to a number saved in Baxter's phone as "Melissa (Gcso)",
presumably Sergeant Melissa Melton of the Garvin County Sheriff's Office, on
August 7, 2023.  At 12:05 p.m., Baxter asked ,"With [sic] happened with turley?"
After Melton replied that she did not know, Baxter sent a message saying, "I'm a
nervous ass wteck... [sic] they called me this am and told me they incubated [sic]
her and called in her family."  Melton and Baxter then discussed what may have
been wrong with Turley and Turley's previous visits to the hospital.  Baxter stated
that she knew about Turley's diagnosis of gallstones.

50.    Based on my training and experience, I know that individuals who are in the
process of committing, or have already committed, civil rights violations often speak to others
about the nature of these violations, the conduct giving rise to them, their mental state, and their
concerns over facing accountability for such actions.  Over the course of August 6, 2023, text
and e-mail messages, search history, application data, and other information stored on Baxter's
iCloud storage may contain information that demonstrates knowledge and willfulness as to the
nature of her deprivation of Turley's right to be free from deliberate indifference to serious
medical needs and substantial risks of serious physical harm.  Surveillance footage from the
Garvin County Jail on August 6, 2023, depicts Baxter using her phone, the SUBJECT PHONE,
for significant portions of the day.  Such footage depicts her not only using the SUBJECT
PHONE for phone calls, but also typing and reading on the phone.  Knowing what Baxter was
typing and reading would provide material evidence of Baxter's mental state over the course of
the day of August 6, 2023.  Further, Baxter's messages and other information from the period of

time after Turley left the Jail, August 7, 2023, onward, may show Baxter's guilt or concern as to her previous actions, particularly her failure to seek medical help for Turley and her failure to keep Turley from harm at the hands of other inmates. Such evidence is critical in proving that any violation of 18 U.S.C. § 242 was done willfully, as such charges require proof that a defendant knew that what he or she was doing was wrong and chose to do it anyway.

## BACKGROUND CONCERNING APPLE[1]

51.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

52.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages")

---

[1]    The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

        c.    iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

        d.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

        e.    Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

53.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

54.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means

23

of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

55.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

56.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition,

24

information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

57. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

58. As described in more detail in Attachment B, the requested warrant seeks iCloud data related to the account of former Garvin County Sheriff's Office Jail Sergeant Jennifer Baxter. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files

and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my experience in investigations such as this, such data is particularly helpful in helping to establish a subject's mental state, particularly their knowledge of critical facts and their knowledge that their actions were wrong.

59. The stored communications and files connected to Baxter's Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation, or to discuss possible culpability after the fact.

60. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or, as is particularly critical in civil rights investigations, consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement), as such evidence can show that a subject knew that their conduct was wrong.

61. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

62.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation.

### **CONCLUSION**

63.     Based on the forgoing, I request that the Court issue the proposed search warrant.

64.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Casey S. Cox
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _June 13_____, 2024

Honorable Suzanne Mitchell
UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with a cellular phone operating on the T-Mobile network assigned number 405-965-1307 (International Mobile Subscriber Identity: 310260580422740 (Apple iPhone with blue case)) and operated by Former Garvin County Jail Sergeant Jennifer Louise Baxter that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 3, 2024, Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

      c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

      d.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, MMS messages, and any stored contents from downloaded messaging apps such as WhatsApp and Signal) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

      e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and capability query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My and AirTag logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with AirTags, Location Services, Find My, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).


Apple is hereby ordered to disclose the above information to the government within **30 DAYS** of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 242, those violations involving former Garvin County Jail Sergeant Jennifer Baxter, former Garvin County Jail Nurse Lynnsee Noel, and former Garvin County Jail Deputies Alesha Danielle Ingram and Vincent Matthews and occurring after July 14, 2023, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.    Any and all names and phone numbers of persons who contacted or were contacted by the SUBJECT PHONE, including records that help reveal their whereabouts;

b.    Images, pictures, photographs sent or received by the SUBJECT PHONE;

c.    The content of any and all text and multimedia messages and emails on the SUBJECT PHONE, including text, multimedia, and emails sent or received, in draft mode, deleted or retained;

d.    The content of any and all voice mail messages, deleted or retained;

e.    Any and all evidence of passwords needed to access the SUBJECT PHONE;

f.    Any and all records showing dominion, ownership, custody, or control over the SUBJECT PHONE;

g.    All records, documents, and images, deleted or retained, relating to communications between former Garvin County Jail Sergeant Jennifer Baxter, former Garvin County Jail Nurse Lynnsee Noel, former Garvin County Jail Deputies Alesha Danielle Ingram and Vincent Matthews, and any other Garvin County Sheriff's Office or Turnkey Health employee concerning Garvin County Jail inmates, including, but not limited to: inmates Kayla Turley, Tiffani Stapp, and Kathleen Tolison;

     h.       All records, documents, and images, deleted or retained, relating to the mistreatment of inmates or prisoners;

     i.       All records, documents, and images, deleted or retained, relating to former Garvin County Jail Sergeant Jennifer Baxter, former Garvin County Jail Nurse Lynnsee Noel, and former Garvin County Jail Deputies Alesha Danielle Ingram and Vincent Matthews's views on inmates or prisoners;

     j.       All records documents, images, or communications, deleted or retained, relating to the assault, medical deterioration, and death of Garvin County Jail inmate Kayla Turley;

     k.       Evidence indicating how and when the SUBJECT PHONE was accessed or used to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

     l.       Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

     m.       The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2